

**PNC EQUIPMENT FINANCE**

## Master Loan & Security Agreement

**EXHIBIT 1**

THIS MASTER LOAN AND SECURITY AGREEMENT ("**Master Agreement**"), is entered into as of this 23rd day of August, 2019, by and between **GO LOGISTICS, INC.** ("**Borrower**" or "**Grantor**"), with its principal place of business at 8101 W Courte Dr. #511 Niles, IL 60714 and PNC Equipment Finance, LLC ("**Lender**" or "**PNCEF**"), with its principal place of business at 995 Dalton Avenue, Cincinnati, Ohio 45203.

From time to time, Borrower is desirous of obtaining a loan or loans from Lender and, at Lender's discretion, Lender may make such loan or loans to Borrower upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## Agreement

**1. LOAN:**
(a) **Agreement to Lend:** Lender hereby agrees, from time to time, subject to the conditions set forth herein, to make a loan or loans (individually a "**Loan**" and collectively, the "**Loans**") to Borrower, the respective principal amounts, interest rates, repayment terms and other provisions relating to which are set forth on an applicable Note or Notes (as hereinafter defined). The proceeds of each Loan will be used for the purpose of acquiring the Equipment, as further described below.
(b) **Repayment of Loan; Evidence of Debt:** The obligation to repay the Loans made hereunder shall be evidenced by one or more promissory notes payable by Borrower to the order of Lender, in form and substance satisfactory to Lender (hereinafter individually a "**Note**" and collectively referred to "**Notes**"). Each Note executed hereunder shall be deemed to have incorporated the terms and conditions of this Master Agreement. In the event of any default by Borrower in payment or performance of any of the Obligations (as such term is hereinafter defined in Annex A), or any obligations hereunder, Lender may declare this Master Agreement and the Notes, and any related schedule, supplement, guaranty, security agreement, instrument or other agreement or document executed in conjunction herewith (collectively, the "**Loan Documents**") to be in default hereunder, and Lender may proceed with its remedies against Borrower, in accordance with the any or all of the Loan Documents.
(c) **Lender's Discretion: This Master Agreement and the Loans do not constitute a committed line of credit.** Borrower acknowledges and agrees that Loans made under this Master Agreement, if any, shall be made at Lender's sole discretion. Lender may decline to make any Loan requested by Borrower at any time and for any reason without prior notice to Borrower.
(d) **Term of Agreement:** The obligations of the parties under this Master Agreement shall commence upon the written acceptance hereof by Lender and shall end upon full performance and observation of each and every term, condition and covenant set forth in this Master Agreement and any extensions, modifications or amendments hereto.

**2. SECURITY:** As security for the payment and performance of the Obligations, Grantor hereby assigns and grants to Lender, as secured party, a continuing lien on and security interest in the collateral described hereunder ("**Collateral**"), and such assignment and grant of security interest in the Collateral is further described in the security agreement terms and conditions attached hereto as Annex A, incorporated herein and made a part hereof by reference thereto, including, without limitation, any collateral exhibit(s) or schedule(s) attached therein, and hereinafter collectively referred to as the "**Collateral Schedule**", now or hereafter executed thereunder and attached thereto describing the acquired equipment, and all replacements, substitutions and exchanges therefor and thereof and accessions thereto ("**Equipment**"). Grantor agrees that, with respect to the Collateral, Lender shall have all of the rights and remedies of a secured party under the UCC. Grantor hereby authorizes Lender to file UCC financing statements ("**UCC Statements**") describing the Collateral. Without Lender's prior written consent, Grantor agrees not to file any corrective or termination statements or partial releases with respect to any UCC Statements filed by Lender pursuant to this Master Agreement. Unless expressly provided to the contrary in documentation for any other loan or loans, it is the express intent of the Lender and the Borrower that all Obligations, including those included in each Loan hereunder, be cross-collateralized and cross-defaulted, such that collateral securing any of the Obligations shall secure repayment of all Obligations, and Borrower agrees that a default under any Obligation shall be a default under all Obligations; provided, however, that, in the event the Lender assigns any interest in a Loan, as permitted pursuant to the section herein titled "Successors and Assigns," such assigned Loan shall constitute a singular obligation of Borrower to the Participant, as defined below, and shall be secured by the Collateral acquired by the proceeds of just that particular Loan, and as described on the appropriate Collateral Schedule.

**3. ADVANCES:** Lender may, in its sole discretion and subject to receipt of documentation satisfactory to Lender, at Borrower's periodic request, make such advances, deposits and reimbursements as may be required for payment for, and purchase of, the Equipment, and each such advance, deposit or reimbursement shall be an advance of principal of a Loan (collectively, "**Advance**"); provided, however, that there shall be no Event of Default (as such term is defined in any Loan Document) or event which with the passage of time, the giving of notice or both would constitute an Event of Default shall have occurred and be continuing, and no event shall have occurred which could have a material adverse effect.

**4. PAYMENTS:** All payments, including any interim payments, in respect of a Loan, as described in the applicable Note, shall be in the amounts stated in such related Note. Payments are an absolute obligation of Borrower, due and payable as set forth on the applicable Note, irrespective of any claims, demands, set-offs, actions, suits or proceedings that Borrower may have or assert against Lender or any supplier of any of the Collateral.

**5. DELIVERY AND INSTALLATION:** Borrower will select the Equipment and the supplier, and will order the Equipment from such supplier. Lender shall not be liable for loss or damage for any reason such as failure of or delay in delivery, delivery to wrong location, delivery of improper equipment or property other than the Equipment, defects in or damage to the Equipment, governmental regulations, strikes, embargoes or other causes, circumstances or events. If the cost of any item of Equipment differs from the price set forth in the purchase order or the advance request, the payments due on the applicable Loan shall be changed to fully reflect any such difference.

**6. SUCCESSORS AND ASSIGNS:** This Master Agreement shall inure to the benefit of Lender, its successors and assigns, and shall be binding upon the successors of Borrower. The rights and obligations of Borrower under this Master Agreement may not be assigned or delegated. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, Lender's rights and obligations hereunder, in a Loan, its respective Note, and Collateral, in any other Loan Documents, and/or the Obligations held by it to others at any time and from time to time; and Lender may disclose to any such purchaser, assignee, transferee or participant ("**Participant**"), or potential Participant, any information concerning the Borrower, including information pertaining to the Borrower's financial condition, business operations or general creditworthiness, and this Master Agreement and all information, reports, financial statements and documents executed or obtained in connection with this Master Agreement which Lender now or hereafter may have relating to any Loan, Borrower, or the business of Borrower. For avoidance of doubt, Borrower hereby acknowledges and agrees that any disclosure of information concerning the Borrower to Participant is permissible as an allowable recipient under the section herein titled "Confidentiality." Borrower hereby grants to any Participant all liens, rights and remedies of Lender under the provisions of this Master Agreement or any other documents relating hereto or under applicable laws. Borrower agrees that any Participant may enforce such liens and exercise such rights and remedies in the same manner as if such Participant were Lender and a direct creditor of Borrower. Upon the request of any Participant, Borrower agrees to promptly execute and deliver to Participant an acknowledgment of the assignment, transfer or sale of participation interest, in form and substance satisfactory to Participant.

**7. MISCELLANEOUS:**
(a) **Notices:** All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("**Notices**") must be in writing (except as may be agreed otherwise above with respect to borrowing requests) and will be effective upon receipt. Notices may be given in any manner to which the parties may separately agree, including electronic mail. Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in

which provided, Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this section.

(b) **Preservation of Rights:** No delay or omission on the Lender's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Lender's action or inaction impair any such right or power. The Lender's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Lender may have under other agreements, at law or in equity.

(c) **Illegality:** If any provision contained in this Master Agreement should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Master Agreement.

(d) **Changes in Writing:** No modification, amendment or waiver of, or consent to any departure by the Borrower from, any provision of this Master Agreement will be effective unless made in a writing signed by the party to be charged, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Notwithstanding the foregoing, the Lender may modify this Master Agreement or any of the other Loan Documents for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Lender shall send a copy of any such modification to the Borrower (which notice may be given by electronic mail). No notice to or demand on the Borrower will entitle the Borrower to any other or further notice or demand in the same, similar or other circumstance.

(e) **Entire Agreement:** This Master Agreement (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

(f) **Counterparts:** This Master Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Master Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart. Any party so executing this Master Agreement by electronic transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by electronic transmission.

(g) **Interpretation:** In this Master Agreement, unless the Lender and the Borrower otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Master Agreement; and references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Master Agreement. Section headings in this Master Agreement are included for convenience of reference only and shall not constitute a part of this Master Agreement for any other purpose. Unless otherwise specified in this Master Agreement, all accounting terms shall be interpreted and all accounting determinations shall be made in accordance with GAAP. If this Master Agreement is executed by more than one party as Borrower, the obligations of such persons or entities will be joint and several.

(h) **No Consequential Damages, etc.:** The Lender will not be responsible for any damages, consequential, incidental, special, punitive or otherwise, that may be incurred or alleged by any person or entity, including the Borrower and any Guarantor, as a result of this Master Agreement, the other Loan Documents, the transactions contemplated hereby or thereby, or the use of the proceeds of the Loan.

(i) **Confidentiality:** In connection with the Obligations, this Master Agreement and the other Loan Documents, the Lender and the Borrower will be providing to each other, whether orally, in writing or in electronic format, nonpublic, confidential or proprietary information (collectively, "**Confidential Information**"). Each of the Borrower and the Lender agrees (i) to hold the Confidential Information of the other in strict confidence; (ii) not to disclose or permit any other person or entity access to the Confidential Information of the other party, except for disclosure or access to a party's affiliates and its or their employees, officers, directors, agents, representatives, or other third parties that provide or may provide ancillary support relating to the Obligations, this Master Agreement and/or the other Loan Documents and require disclosure or access in the course of employment or services, or to its external or internal auditors or regulatory authorities, and (iii) not to use such Confidential Information except in connection with the Obligations and for the purposes of this Master Agreement and the other Loan Documents. It is understood and agreed that the obligation to protect such Confidential Information shall be satisfied if the party receiving such Confidential Information utilizes the same control (but no less than reasonable) as it does to avoid disclosure of its own confidential and valuable information. It is also understood and agreed that no information shall be within the protection of this Master Agreement where such information: (a) is or becomes publicly available through no fault of the party to whom such Confidential Information has been disclosed; (b) is released by the originating party to anyone without restriction; (c) is rightly obtained from third parties who are not, to such receiving party's knowledge, under an obligation of confidentiality; or (d) is required to be disclosed by subpoena or similar process of applicable law or regulations.

For the purposes of this Master Agreement, Confidential Information of a party shall include, without limitation, any financial information, scientific or technical information, design, process, procedure or improvement and all concepts, documentation, reports, data, data formats, specifications, computer software, source code, object code, user manuals, financial models, screen displays and formats, software, databases, inventions, knowhow, showhow and trade secrets, whether or not patentable or copyrightable, whether owned by a party or any third party, together with all memoranda, analyses, compilations, studies, notes, records, drawings, manuals or other documents or materials which contain or otherwise reflect any of the foregoing information.

Each of the Borrower and the Lender agrees to return to the other or destroy all Confidential Information of the other upon the termination of this Master Agreement; provided, however, each party may retain such limited information for customary archival and audit purposes only for reference with respect to prior dealings between the parties subject at all times to the continuing terms of this section.

Each of the Borrower and the Lender agrees not to use the other's name or logo in any marketing, advertising or related materials, without the prior written consent of the other party.

(j) **Sharing Information with Affiliates of the Lender:** The Borrower acknowledges that from time to time other financial and banking services may be offered or provided to the Borrower or one or more of its subsidiaries and/or affiliates (in connection with this Master Agreement or otherwise) by PNC Bank, National Association, parent of the Lender, or by one or more subsidiaries or affiliates of the Lender or of The PNC Financial Services Group, Inc., and the Borrower hereby authorizes the Lender to share any information delivered to the Lender by the Borrower and/or its subsidiaries and/or affiliates pursuant to this Master Agreement or any of the Loan Documents to any subsidiary or affiliate of the Lender and/or The PNC Financial Services Group, Inc., subject to any provisions of confidentiality in this Master Agreement or any other Loan Documents.

(k) **Governing Law and Jurisdiction:** This Master Agreement has been delivered to and accepted by the Lender and will be deemed to be made in the State of Illinois ("**Governing State**"). **This Master Agreement will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the Governing State, excluding its conflict of laws rules, except that the laws of the State where any Collateral is located (if different from the Governing State) shall govern the creation, perfection and foreclosure of the liens created hereunder on such property or any interest therein.** The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district of the Governing State; provided that nothing contained in this Master Agreement will prevent the Lender from bringing any action, enforcing any award or judgment or exercising any rights against the Borrower individually, against any security or against any property of the Borrower within any other county, state or other foreign or domestic jurisdiction. The Lender and the Borrower agree that the venue provided above is the most convenient forum for both the Lender and the Borrower. The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Master Agreement.

(l) **WAIVER OF JURY TRIAL: EACH OF THE BORROWER AND THE LENDER IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS MASTER AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS MASTER AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE BORROWER AND THE LENDER ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

The Borrower acknowledges that it has read and understood all the provisions of this Master Agreement, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.

| Lender: PNC Equipment Finance, LLC (a Delaware limited liability company) | Borrower/Grantor: GO LOGISTICS, INC. (an Illinois corporation) |
|---|---|
| Signature X *Melissa Knollman* | Signature X *[signature]* |
| Print Name: Melissa Knollman | Print Name: OVIDIU ASTALUS |
| Title: Officer | Title: PRESIDENT |
| Date: 8-28-19 | Date: 8-26-19 |

WITNESS the due execution hereof with the intent to be legally bound.

# PNC EQUIPMENT FINANCE

**Annex A**

THIS SECURITY AGREEMENT (this "**Agreement**") is made by the Grantor in favor of PNCEF, and is a part of and incorporated into the Master Agreement, as referenced and described thereunder.

Under the terms hereof, PNCEF desires to obtain and the Grantor desires to grant PNCEF security for all of the Obligations (as hereinafter defined).

**NOW, THEREFORE**, the Grantor and PNCEF, intending to be legally bound, hereby agree as follows:

1. **DEFINITIONS:**

(a) If and when, at any time, Grantor has Obligations outstanding, as defined below, that include, among other things, advances or other interim financing owing by Grantor to PNCEF or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future ("**Interim Financing Obligations**"), "**Collateral**" shall include, in addition to any Collateral referenced in subsection 1(b) hereunder, all personal property of the Grantor, including the following, all whether now owned or hereafter acquired or arising and wherever located: (i) accounts (including health-care-insurance receivables and credit card receivables); (ii) securities entitlements, securities accounts, commodity accounts, commodity contracts and investment property; (iii) deposit accounts; (iv) instruments (including promissory notes); (v) documents (including warehouse receipts); (vi) chattel paper (including electronic chattel paper and tangible chattel paper); (vii) inventory, including raw materials, work in process, or materials used or consumed in Grantor's business, items held for sale or lease or furnished or to be furnished under contracts of service, sale or lease, goods that are returned, reclaimed or repossessed; (viii) goods of every nature, including stock-in-trade, goods on consignment, standing timber that is to be cut and removed under a conveyance or contract for sale, the unborn young of animals, crops grown, growing, or to be grown, manufactured homes, computer programs embedded in such goods and farm products; (ix) equipment, including machinery, vehicles and furniture; (x) fixtures; (xi) agricultural liens; (xii) as-extracted collateral; (xiii) commercial tort claims, if any, described on Exhibit B hereto (if an Exhibit B is attached); (xiv) letter of credit rights; (xv) general intangibles, of every kind and description, including payment intangibles, software, computer information, source codes, object codes, records and data, all existing and future customer lists, choses in action, claims (including claims for indemnification or breach of warranty), books, records, patents and patent applications, copyrights, trademarks, tradenames, tradestyles, trademark applications, goodwill, blueprints, drawings, designs and plans, trade secrets, contracts, licenses, license agreements, formulae, tax and any other types of refunds, returned and unearned insurance premiums, rights and claims under insurance policies; (xvi) all supporting obligations of all of the foregoing property; (xvii) all property of the Grantor now or hereafter in PNCEF's possession or in transit to or from, or under the custody or control of, PNCEF or any affiliate thereof; (xviii) all cash and cash equivalents thereof; and (xix) all cash and noncash proceeds (including insurance proceeds) of all of the foregoing property, all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof. The Collateral shall also include any and all other tangible or intangible property that is described as being part of the Collateral pursuant to one or more Riders to Security Agreement that may be attached hereto or delivered in connection herewith, including the Rider to Security Agreement - Copyrights, the Rider to Security Agreement - Patents, the Rider to Security Agreement - Trademarks and the Rider to Security Agreement - Cash Collateral Account.

(b) If and when, at any time, Grantor has Obligations outstanding that do not include Interim Financing Obligations, "**Collateral**" shall only include: (i) the Grantor's equipment, inventory, and fixtures financed by PNCEF, when and as described on Exhibit C, attached hereto or to be attached hereto, and made a part hereof ("**Equipment**"); all goods and general intangibles relating to, arising from or embedded in the Equipment, all cash and non-cash proceeds (including insurance proceeds) of the Equipment, all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof; and (ii) the Grantor's motor vehicles financed by PNCEF, when and as described on Exhibit C, attached hereto or to be attached hereto, and made a part hereof ("**Motor Vehicles**"); all general intangibles (including payment intangibles, books and records) relating to or arising from the Motor Vehicles; all supporting obligations of all of the foregoing property; all cash and non-cash proceeds (including insurance proceeds) of all of the foregoing property, all products thereof and all additions and accessions thereto whether or not installed in, related, attached or added to or used in connection with any Motor Vehicle, substitutions therefor and replacements thereof.

(c) "**Obligations**" shall include all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Grantor or any other Borrower to PNCEF or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Grantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of PNCEF to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of PNCEF's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements; and any amendments, extensions, renewals and increases of or to any of the foregoing, and all costs and expenses of PNCEF incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses.

2. **GRANT OF SECURITY INTEREST:** To secure the Obligations, the Grantor, as debtor, hereby assigns and grants to PNCEF, as secured party, a continuing lien on and security interest in the Collateral.

3. **CHANGE IN NAME OR LOCATIONS:** The Grantor hereby agrees that if the location of the Collateral changes from the locations listed on Exhibit C hereto and made part hereof, or if the Grantor changes its name, its type of organization, including a division into two or more entities, its state of organization (if Grantor is a registered organization), its principal residence (if Grantor is an individual), its chief executive office (if Grantor is a general partnership or non-registered organization) or establishes a name in which it may do business that is not listed as a tradename on Exhibit A hereto, the Grantor will immediately notify PNCEF in writing of the additions or changes.

4. **GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS:** The Grantor represents, warrants and covenants to PNCEF that: (a) all

Information, including its type of organization, jurisdiction of organization, chief executive office, and (for individuals only) principal residence are as set forth on Exhibit A hereto and are true and correct on the date hereof, (b) if the Grantor is an individual, the Grantor's name in this Agreement is identical to the Grantor's name indicated on an unexpired driver's license issued to the Grantor by the state of the Grantor's principal residence, and the Grantor will continue to maintain such driver's license and notify PNCEF of any changes in the Grantor's name or the name indicated on such driver's license; (c) the Grantor has good, marketable and indefeasible title to the Collateral, has not made any prior sale, pledge, encumbrance, assignment or other disposition of any of the Collateral, and the Collateral is free from all encumbrances and rights of setoff of any kind except the lien in favor of PNCEF created by this Agreement and other liens consented to in writing by PNCEF; and (d) the Grantor will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein.

**5. GRANTOR'S REPRESENTATIONS, WARRANTIES AND COVENANTS FOR CERTAIN COLLATERAL:** The Grantor represents, warrants and covenants to PNCEF as follows (if and when the Collateral is defined pursuant to subsection 1(a) herein, subsections 5(a) through 5(k) shall be applicable to such Collateral; if and when the Collateral is defined pursuant to subsection 1(b) herein, subsections 5(a) through 5(e) shall be applicable to such Collateral):

(a) From time to time and at all reasonable times, the Grantor will allow PNCEF, by or through any of its officers, agents, attorneys, or accountants, to examine or inspect the Collateral, and obtain valuations and audits of the Collateral, at the Grantor's expense, wherever located. The Grantor shall do, obtain, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as PNCEF may require to vest in and assure to PNCEF its rights hereunder and in or to the Collateral, and the proceeds thereof, including waivers from landlords, warehousemen and mortgagees.

(b) The Grantor will keep the Collateral in good order and repair at all times and immediately notify PNCEF of any event causing a material loss or decline in value of the Collateral, whether or not covered by insurance, and the amount of such loss or depreciation.

(c) The Grantor will only use or permit the Collateral to be used in accordance with all applicable federal, state, county and municipal laws and regulations including laws and regulations relating to the titling, registration and operation of Motor Vehicles.

(d) The Grantor will have and maintain insurance at all times with respect to all Collateral against risks of fire (including so-called extended coverage), theft, sprinkler leakage, and other risks (including risk of flood if any Collateral is maintained at a location in a flood hazard zone) as PNCEF may require, in such form, in such amount, for such period and written by such companies as may be satisfactory to PNCEF in its sole discretion. Each such casualty insurance policy shall contain a standard Lender's Loss Payable Clause issued in favor of PNCEF under which all losses thereunder shall be paid to PNCEF as PNCEF's interests may appear. Such policies shall expressly provide that the requisite insurance cannot be altered or canceled without at least 30 days' prior written notice to PNCEF and shall insure PNCEF notwithstanding the act or neglect of the Grantor. Upon PNCEF's demand, the Grantor will furnish PNCEF with duplicate original policies of insurance or such other evidence of insurance as PNCEF may require. If the Grantor fails to provide insurance as herein required, PNCEF may, at its option, obtain such insurance and the Grantor will pay to PNCEF, on demand, the cost thereof. Proceeds of insurance may be applied by PNCEF to reduce the Obligations or to repair or replace Collateral, all in PNCEF's sole discretion. If the Collateral consists of Motor Vehicles, the Grantor shall also maintain general liability insurance at all times in such coverage amount, for such period, and written by such companies, as may be satisfactory to PNCEF in its sole discretion.

(e) If a certificate of title is required to be issued for any Motor Vehicle, Grantor shall deliver to PNCEF (together with any other documentation requested by PNCEF) the certificate of title for each Motor Vehicle, together with such other documentation requested by PNCEF, appropriately executed by Grantor so that PNCEF may cause its encumbrance to be noted on the such titles by the appropriate authorities. PNCEF will retain such titles until all the Obligations have been paid in full.

(f) Each account and general intangible is genuine and enforceable in accordance with its terms, no such account or general intangible will be subject to any claim for credit, allowance or adjustment by any account debtor or any setoff, defense or counterclaim, and the Grantor will defend the same against all claims, demands, setoffs and counterclaims at any time asserted. At the time any account or general intangible becomes subject to this Agreement, such account or general intangible will be a good and valid account representing a bona fide sale of goods or services by the Grantor and such goods will have been shipped to the respective account debtors or the services will have been performed for the respective account debtors.

(g) The Grantor agrees that PNCEF has the right to notify (on invoices or otherwise) account debtors and other obligors or payors on any Collateral of its assignment to PNCEF, and that all payments thereon should be made directly to PNCEF.

(h) The Grantor will, on PNCEF's demand, make notations on its books and records showing PNCEF's security interest and make available to PNCEF shipping and delivery receipts evidencing the shipment of the goods that gave rise to an account, completion certificates or other proof of the satisfactory performance of services that gave rise to an account, a copy of the invoice for each account and copies of any written contract or order from which an account arose. The Grantor will promptly notify PNCEF if an account becomes evidenced or secured by an instrument or chattel paper and upon PNCEF's request, will promptly deliver any such instrument or chattel paper to PNCEF, including any letter of credit delivered to the Grantor to support a shipment of inventory by the Grantor.

(i) The Grantor will promptly advise PNCEF whenever an account debtor refuses to retain or returns any goods from the sale of which an account arose and will comply with any instructions that PNCEF may give regarding the sale or other disposition of such returns. From time to time with such frequency as PNCEF may request, the Grantor will report to PNCEF all credits given to account debtors on all accounts.

(j) The Grantor will immediately notify PNCEF if any account arises out of contracts with the United States or any department, agency or instrumentality thereof, and will execute any instruments and take any steps required by PNCEF so that all monies due and to become due under such contract shall be assigned to PNCEF and notice of the assignment given to and acknowledged by the appropriate government agency or authority under the Federal Assignment of Claims Act.

(k) At any time after the occurrence of an Event of Default, and without notice to the Grantor, PNCEF may direct any persons who are indebted to the Grantor on any Collateral consisting of accounts or general intangibles to make payment directly to PNCEF of the amounts due, and PNCEF may notify the United States Postal Service to send the Grantor's mail to PNCEF. PNCEF is authorized to collect, compromise, endorse and sell any such Collateral in its own name or in the Grantor's name and to give receipts to such account debtors for any such payments and the account debtors will be protected in making such payments to PNCEF. Upon PNCEF's written request, the Grantor will establish with PNC Bank, National Association ("**Bank**") and maintain a lockbox account ("**Lockbox**") with the Bank and a depository account(s) ("**Cash Collateral Account**") with the Bank subject to the provisions of this subparagraph and such other related Agreements as the Bank and/or PNCEF may require, and the Grantor shall notify its account debtors to remit payments directly to the Lockbox. Thereafter, funds collected in the Lockbox shall be transferred to the Cash Collateral Account, and funds in the Cash Collateral Account shall be applied by PNCEF, daily, to reduce the outstanding Obligations.

**6. NEGATIVE PLEDGE; NO TRANSFER:** Without PNCEF's prior written consent, the Grantor will not sell or offer to sell or otherwise transfer (including, without limitation, any transfer resulting from a division of the Grantor into two or more entities) or grant or allow the imposition of a lien, security interest or right of setoff upon the Collateral (except for sales of inventory and collections of accounts in the Grantor's ordinary course of business), will not allow any third party to gain control of all or any part of the Collateral, and will not use any portion of the Collateral in any manner inconsistent with this Agreement or with the terms and conditions of any policy of insurance thereon.

**7. FURTHER ASSURANCES:** By its signature hereon, the Grantor hereby irrevocably authorizes PNCEF to file against the Grantor one or more financing, continuation or amendment statements pursuant to the UCC in form satisfactory to PNCEF, and the Grantor will pay the cost of preparing and filing the same in all jurisdictions in which such filing is deemed by PNCEF to be necessary or desirable in order to perfect, preserve and protect its security interests. If required by PNCEF, the Grantor will execute all documentation necessary for PNCEF to obtain and maintain perfection of its security interests in the Collateral. If and when the Collateral is defined pursuant to subsection 1(a) herein, at PNCEF's request, the Grantor will execute, in form satisfactory to PNCEF, a Rider to Security Agreement - Copyrights (if any Collateral consists of registered or unregistered copyrights), a Rider to Security Agreement - Patents (if any Collateral consists of patents or patent applications), a Rider to Security Agreement - Trademarks (if any Collateral consists of trademarks, tradenames, tradestyles or trademark applications). If

any Collateral consists of letter of credit rights, electronic chattel paper, deposit accounts or supporting obligations not maintained with PNCEF or one of its affiliates, or any securities entitlement, securities account, commodities account, commodities contract or other investment property, then at PNCEF's request the Grantor will execute, and will cause the depository institution or securities intermediary upon whose books and records the ownership interest of the Grantor in such Collateral appears, to execute such Pledge Agreements, Notification and Control Agreements or other agreements as PNCEF deems necessary in order to perfect, prioritize and protect its security interest in such Collateral, in each case in a form satisfactory to PNCEF. At PNCEF's request, the Grantor will join with PNCEF in executing one or more certificates of title, vehicle lien applications, title lien statements, and any other instruments and/or documents required to be filed with respect to any Motor Vehicles (collectively, "**Title Documents**"). By its signature hereon, the Grantor hereby irrevocably authorizes PNCEF to execute (on behalf of the Grantor) and file against the Grantor one or more financing, continuation or amendment statements pursuant to the UCC. All such Title Documents and statements pursuant to the UCC shall be in form satisfactory to PNCEF, and the Grantor will pay the cost of preparing and filing the same in all jurisdictions in which such filing is deemed by PNCEF to be necessary or desirable in order to perfect, preserve and protect its security interests. A carbon, photographic or other copy of this Agreement or of any Title Document may be filed as and in lieu of any such Title Document.

8. **EVENTS OF DEFAULT:** The Grantor shall, at PNCEF's option, be in default under this Agreement upon the happening of any of the following events or conditions (each, an "**Event of Default**"): (a) any Event of Default (as defined in any of the Obligations); (b) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in such Obligations with respect to such default; (c) demand by PNCEF under any of the Obligations that have a demand feature; (d) the failure by the Grantor to perform any of its obligations under this Agreement; (e) falsity, inaccuracy or material breach by the Grantor of any written warranty, representation or statement made or furnished to PNCEF by or on behalf of the Grantor; (f) an uninsured material loss, theft, damage, or destruction to any of the Collateral, or the entry of any judgment against the Grantor or any lien against or the making of any levy, seizure or attachment of or on the Collateral; (g) the failure of PNCEF to have a perfected first priority security interest in the Collateral; (h) any indication or evidence received by PNCEF that the Grantor may have directly or indirectly been engaged in any type of activity which, in PNCEF's discretion, might result in the forfeiture of any property of the Grantor to any governmental entity, federal, state or local; or (i) if PNCEF otherwise deems itself insecure.

9. **REMEDIES:** Upon the occurrence of any such Event of Default and at any time thereafter, PNCEF may declare all Obligations secured hereby immediately due and payable and shall have, in addition to any remedies provided herein or by any applicable law or in equity, all the remedies of a secured party under the UCC. PNCEF's remedies include, but are not limited to, the right to (a) peaceably by its own means or with judicial assistance enter the Grantor's premises and take possession of the Collateral without prior notice to the Grantor or the opportunity for a hearing, (b) render the Collateral unusable, (c) dispose of the Collateral on the Grantor's premises, and (d) require the Grantor to assemble the Collateral and make it available to PNCEF at a place designated by PNCEF. The Grantor agrees that PNCEF has full power and authority to collect, compromise, endorse, sell or otherwise deal with the Collateral in its own name or that of the Grantor at any time upon an Event of Default. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, PNCEF will give the Grantor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The requirements of commercially reasonable notice shall be met if such notice is sent to the Grantor at least ten days before the time of the intended sale or disposition. Expenses of retaking, holding, preparing for disposition, disposing or the like shall include PNCEF's reasonable attorneys' fees and legal expenses, incurred or expended by PNCEF to enforce any payment due it under this Agreement either as against the Grantor, or in the prosecution or defense of any action, or concerning any matter growing out of or connection with the subject matter of this Agreement and the Collateral pledged hereunder. The Grantor waives all relief from all appraisement or exemption laws now in force or hereafter enacted.

10. **POWER OF ATTORNEY:** The Grantor does hereby make, constitute and appoint any officer or agent of PNCEF as the Grantor's true and lawful attorney-in-fact, with power to (a) endorse the name of the Grantor or any of the Grantor's officers or agents upon any notes, checks, drafts, money orders, or other instruments of payment or Collateral that may come into PNCEF's possession in full or part payment of any Obligations; (b) sue for, compromise, settle and release all claims and disputes with respect to, the Collateral; and (c) sign, for the Grantor, such documentation required by the UCC, any Title Documents and amendments thereto, or supplemental intellectual property security agreements; granting to the Grantor's said attorney full power to do any and all things necessary to be done in and about the premises as fully and effectually as the Grantor might or could do. The Grantor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest, and is irrevocable.

11. **PAYMENT OF EXPENSES:** At its option, PNCEF may discharge taxes, liens, security interests or such other encumbrances as may attach to the Collateral, may pay for required insurance on the Collateral and may pay for the maintenance, appraisal or reappraisal, and preservation of the Collateral, as determined by PNCEF to be necessary. The Grantor will reimburse PNCEF on demand for any payment so made or any expense incurred by PNCEF pursuant to the foregoing authorization, and the Collateral also will secure any advances or payments so made or expenses so incurred by PNCEF.

12. **PRESERVATION OF RIGHTS:** No delay or omission on PNCEF's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will PNCEF's action or inaction impair any such right or power. PNCEF's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which PNCEF may have under other agreements, at law or in equity.

13. **ILLEGALITY:** If any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Agreement.

14. **CHANGES IN WRITING:** No modification, amendment or waiver of, or consent to any departure by the Grantor from, any provision of this Agreement will be effective unless made in a writing signed by PNCEF, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Notwithstanding the foregoing, PNCEF may modify this Agreement for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, including, without limitation, the attachment of future equipment and fixture descriptions under Exhibit C hereto, pursuant to subsection 1(b), provided that PNCEF shall send a copy of any such modification to the Grantor (which notice may be given by electronic mail.) No notice to or demand on the Grantor will entitle the Grantor to any other or further notice or demand in the same, similar or other circumstance.

15. **SUCCESSORS AND ASSIGNS:** This Agreement will be binding upon and inure to the benefit of the Grantor and PNCEF and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Grantor may not assign this Agreement in whole or in part (including, without limitation, any transfer resulting from a division of the Lessee into two or more entities) without PNCEF's prior written consent and PNCEF at any time may assign this Agreement in whole or in part.

16. **INTERPRETATION:** In this Agreement, unless PNCEF and the Grantor otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or," the words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Agreement; and references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement. Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. Unless otherwise specified in this Agreement, all accounting terms shall be interpreted and all accounting determinations shall be made in accordance with GAAP. If this Agreement is executed by more than one Grantor, the obligations of such persons or entities will be joint and several.

17. **INDEMNITY:** The Grantor agrees to indemnify each of PNCEF, each legal entity, if any, who controls, is controlled by or is under common control with PNCEF, and each of their respective directors, officers and employees ("**Indemnified Parties**") and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and

preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Grantor), in connection with or arising out of or relating to the matters referred to in this Agreement or the Obligations, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Grantor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this section shall survive the termination of this Agreement, payment of the Obligations and the assignment of any rights hereunder. The Grantor may participate at its expense in the defense of any such claim.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**PNC EQUIPMENT FINANCE**

**Exhibit A**

1. Grantor's name/form of organization (i.e., corporation, partnership, limited liability company): GO LOGISTICS, INC.

2. Grantor's state of organization, if a registered organization (i.e., corporation, limited partnership or limited liability company): ILLINOIS

3. Grantor's principal residence, if a natural person or general partnership:

4. Address of Grantor's chief executive office, including county: 8101 W COURTE #511 NILES, IL 60714 ~COOK COUNTY~

5. Grantor's organizational ID# (if any exists):

6. Address for books and records, if different

7. Addresses of other collateral locations, including counties, for the past five years:

8. Name and address of landlord or owner if location is not owned by the Grantor:

9. Other names or tradenames now or formerly used by the Grantor: